### DU PONT v. DU PONT et al.

#### (District Court, D. Delaware. May 19, 1916.)

#### No. 340.

EQUITY ☞140—BILL—INTERROGATORIES.

    In a stockholder's suit against officers and directors of the corporation, alleging a conspiracy, in violation of their trust, to purchase certain outstanding stock for their own benefit and profit, instead of for the corporation which had the power under its charter and the available means to purchase the same, interrogatories propounded to defendant officers, calling for details of a multitude of business transactions involving also other concerns having no relation to the suit, *held* improper, where the ultimate material facts could be ascertained from the books.

    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 317, 318; Dec. Dig. ☞140.]

In Equity. Suit by Philip F. Du Pont against Pierre S. Du Pont and others. On objection to complainant's interrogatories. Objections sustained.

John G. Johnson, William A. Glasgow, Jr., and Henry P. Brown, all of Philadelphia, Pa., and Robert Penington, of Wilmington, Del., for complainant.

Wm. S. Hilles and John P. Laffey, both of Wilmington, Del., George S. Graham, of Philadelphia, Pa., and William H. Button, of New York City, for defendants.

THOMPSON, District Judge. The interrogatories propounded to Pierre S. Du Pont as president, Alexis I. Du Pont, as secretary, and John J. Raskob, as treasurer, of the E. I. Du Pont de Nemours Powder Company, hereinafter called the Powder Company, and the E. I. Du Pont de Nemours & Co., hereinafter called Du Pont & Co., relate to three classes of facts, namely: (1) The number of contracts under which powder or other war munitions were, or were to be, manufactured or sold by the companies upon certain dates and during the entire period since December 1, 1914, and the aggregate amount of money agreed to be paid under such contracts. (2) The quantities of powder or other war munitions manufactured and sold daily by the companies since December 1, 1914. (3) The names of the banks, banking insti-

tutions, trust companies, banking firms, corporations, or persons which were depositories of the Powder Company on December 1, 1914, and of each company since that date; the daily balances on deposit with such depositories since December 1, 1914, and the dates when the deposit accounts were opened with each of the depositories.

The bill avers that, at the time of the transactions of which complaint is made, the Powder Company was authorized by the terms of its charter to purchase the shares of its own stock outstanding, was abundantly able to purchase all of the common and preferred stock, or any part thereof, held by T. Coleman Du Pont, and, with its assets, was abundantly able *to arrange* to purchase all of the stock.

It is averred that, at the time of the transactions, Pierre S. Du Pont, through his official relations with the Powder Company, was in possession of intimate knowledge of the financial condition of the company and its affairs, and knew that it had entered into, and was likely to enter into, contracts for the sale of large quantities of powder and other explosives with European nations at war through which the Powder Company would, within a short time, begin to realize large profits, and that large dividends would probably be paid thereon out of which Pierre S. Du Pont could pay to T. Coleman Du Pont the purchase price of his stock; that Pierre S. Du Pont fraudulently, and in violation of his trust as an officer, director, and confidential representative of the Powder Company, arranged to purchase the stock at a time when he knew he had misinformed T. Coleman Du Pont as to the feeling of the finance committee upon the question of the purchase, and that he sought out certain of the defendants, who were members of the board of directors, and informed them that he had purchased or could purchase the stock of T. Coleman Du Pont, and invited them to participate in a scheme to organize the Du Pont Securities Company for the purchase of the stock in its name, and in violation of their duty as directors of the Powder Company to defraud the latter through the purchase of the stock for their own private and personal advantage, instead of permitting, as was their duty, the Powder Company to purchase; that the other directors entered into the scheme and the Du Pont Securities Company was organized for that purpose; that Pierre S. Du Pont did not inform the board of directors that T. Coleman Du Pont would sell the shares of stock until the purchase for him and his associates had been consummated; that through the influence of Pierre .S. Du Pont and his associates, and by reason of the fact held out to other members of the board of directors that they would be permitted to share in the purchase of the stock of T. Coleman Du Pont, they became parties to the alleged fraudulent scheme, and voted against a resolution offered in the board of directors that the Powder Company purchase the stock, and thereby the resolution was defeated; that, in order to pay for the stock, it was necessary for Pierre S. Du Pont and his associates to borrow approximately $8,-500,000, and that they did not have either, credit or marketable collateral, which would enable them to effect the loan, and that it was the intention of Pierre S. Du Pont and his associates to obtain the funds necessary to pay the obligations, in connection with the acquisition of

the stock, from dividends which they had reason to believe from the existing contracts and those in prospect would enable them to meet the obligations; that, in arranging for the purchase and securing loans from banking institutions with which to make the cash payment required, Pierre S. Du Pont, by reason of his official connection with the Powder Company and by reason of the connection of his associates with the company, was in position to deposit with the banking institutions large sums of money which had been received and which the company expected to receive from the contracts for furnishing powder to the European nations at war.

It is averred that on September 4, 1915, the E. I. Du Pont de Nemours & Co. was incorporated with a capital stock of $240,000,-000, and has purchased all of the assets and assumed all of the liabilities of the Powder Company, and has paid the Powder Company therefor part in cash, part in debenture stock and part in common stock; that all the common stock of Du Pont & Co. has been distributed two shares for one to the holders of the common stock of the Powder Company; that the board of directors and officers of Du Pont & Co. are the same as the board of directors of the Powder Company, and that the purpose and effect of the transfer of all the assets from the one company to the other was to increase the capitalization of the Powder Company without effecting a change in the ownership of any of its stock; that, in pursuance of the scheme to make use of the Powder Company and its assets to enable the defendants to pay for the stock purchased from T. Coleman Du Pont, the defendants, as directors of Du Pont & Co., and being the majority of the board, at a meeting on November 24, 1915, declared a dividend of 30 per cent., payable in cash on December 15, 1915, on the common stock of Du Pont & Co.; that the condition of the business of Du Pont & Co. made the payment of the dividend injudicious and contrary to the true interests of the company, and its payment may prevent the retention by the company of a sufficient amount of surplus and undivided profits to pay for the T. Coleman Du Pont stock, and that the defendants would not have voted in favor of the dividend except with the purpose of liquidating obligations for the purchase of the stock and of depriving the Powder Company and Du Pont & Co. of ability to pay for it out of surplus and undivided profits.

It is not denied by the individual defendants that, when the stock of T. Coleman Du Pont was purchased and during their negotiations, they had information that contracts were in existence, about to be entered into, and in process of negotiation, and were likely to be made within a short time, which would be exceedingly profitable and would largely enhance the value of the stock of the Powder Company.

If the number of contracts entered into or under negotiation during the period in question, and the aggregate amount of money agreed to be paid to the Powder Company under these contracts, are relied upon as facts to support the averment in the bill that, during the time Pierre S. Du Pont and his associates were negotiating for the purchase of the T. Coleman Du Pont stock, they had information upon which they based an opinion of a large increase in value of the stock

which induced them to make the purchase, those facts would be material in support of plaintiff's cause. That averment, however, is admitted in the answers. The aggregate amount to be received under the contracts would be material as one of the constituent facts to prove another fact, namely, the amount of the assets of the company available for purchase of the T. Coleman Du Pont stock, but such a purchase under the averments of the bill must be from sums reserved out of working capital, or out of surplus or undivided profits. The amount to be received under the powder contracts would not show the sums which were or could be reserved by the company as working capital, nor the amount of the surplus and undivided profits of either the Powder Company or Du Pont & Co. The amount of money which would have been available to purchase the stock is not represented by the total amounts receivable from the powder contracts, and those amounts have no bearing upon it except in connection with all the costs of labor, material, and all other expenses incident to the cost of manufacture and sale. Without doubt the plaintiff would be entitled under the pleadings, in support of his cause, to a disclosure of the assets of the Powder Company out of which the latter would be able under its charter to purchase the stock, but I fail to see what lawful purpose can be served by compelling the defendants to place upon the record information which may disclose a mass of details relative to its business which is undoubtedly calculated to burden, oppress, and harass the corporation defendant, when that information of itself would be of no materiality, but could only be considered in connection with items of cost and expense in order to reach the really material fact. All of the information necessary to arrive at the material fact, namely, what assets were available which either company was able to apply to the purchase of the stock, can be obtained from the contracts themselves and from the books of the defendant companies. This information is entirely within the reach of the plaintiff under the provision of the fifty-eighth equity rule, which empowers the court or judge to make such orders as may be appropriate to effect the inspection or production of documents in possession of the other party, and containing evidence material to the cause of action. With this comprehensive remedy open to the plaintiff, from which the amount available to the Powder Company under the provisions of its charter for the purchase of the stock can be ascertained, he will suffer no deprivation of rights in the production of evidence if the court refuses to sanction the disclosure upon the record of what is but a constituent element in arriving at the essential fact to be ascertained. This reasoning applies to the interrogatories as to both companies and those relating to powder contracts, as well as to those relating to the quantity of powder and other war munitions manufactured and sold daily.

The remaining interrogatories, requiring the names of the depositories of the money of the companies and the daily balances on deposit since the 1st day of December, 1914, and the dates when each account was opened, are intended to support the averment in the bill that Pierre S. Du Pont, by reason of his official connection with the Powder Company, and by reason of the connection of his associates

in the company, was in position to deposit large sums of money derived from the company's contracts with the banking institutions from which the money was borrowed through the Du Pont Securities Company to purchase the stock and thereby obtain, through the funds of the Powder Company, a credit necessary for procuring the loans. There is no averment in the bill that Pierre S. Du Pont, or his associates did deposit the moneys of the company with the banking institutions in question for that purpose, nor that they did obtain the credit necessary to obtain the loans through such deposits. It is averred that it was necessary for them to borrow; that they did not have either credit or marketable collateral which would enable them to effect a loan in the necessary amount. These averments, which are apparently intended to show that Pierre S. Du Pont and his associates had an opportunity to make a fraudulent use of the funds of the company for their own benefit, are not sufficient, in my opinion, to require answers to interrogatories of such broad scope in relation to the depositories of the funds of the companies, the balance on hand with each depository upon each day during the entire period covered, and the time when the deposit accounts were opened. The information asked for would, no doubt, involve a disclosure of the business and financial relations of the corporations with numerous banking institutions other than those from whom the plaintiff may be able to show that the loans in question were secured, and therefore would involve transactions and business, having no bearing upon or materiality to the cause, with institutions having no connection with the loans, and concerning which the plaintiff has no right to discovery. If the interrogatories were so framed as to obtain information only in relation to banking institutions connected in some way with the loan, the facts thus obtained would be material as part of the scheme charged to have been devised and carried out by Pierre S. Du Pont and his associates to show that they obtained for themselves a credit upon which to base the loans, and, by the advantage thus obtained, deprived the Powder Company of an opportunity to use its available assets to arrange for the purchase of the stock, but the interrogatories must be considered as they stand, and they are too broad and sweeping in their scope to require answers. All of the material facts under this class of interrogatories are, equally with those in relation to the powder contracts and the quantities of powder and other war munitions manufactured and sold, available to the plaintiff from the books and accounts of the defendant companies.

The bill is a stockholder's bill in which the plaintiff and the intervening plaintiffs are seeking to enforce against directors and other stockholders of the corporation the rights of the corporation itself, which it is alleged arise from wrongs done by the individual defendants in violation of their duties as trustees for the corporation, and it is averred in the bill that, by reason of the interest of the majority of the directors and their manifest purpose to serve their own interest rather than that of the Powder Company, any effort to persuade them to remedy the wrong through the corporation would be futile and unavailing. Standing, as they claim to do, in the shoes of the cor-

poration itself, which they claim is by reason of the action of the individual defendants, unable to sue in its own behalf, they have the right, upon application to the court, to an order for the inspection of the corporations' books and documents for the purpose of establishing any fact material to the cause. The documents themselves are the best evidence of these facts.

To summarize: The gross receipts under the powder contracts and the quantities manufactured and sold would, at best, be only constituent facts inconclusive and ineffectual, standing alone, in arriving at any material fact. The names of all the depositories, the daily balances they have held for the companies during the entire period covered by the interrogatories, and the dates upon which the accounts were opened would cause the disclosure of a multitude of transactions not material or relevant to throw any light upon the averments in the bill and involving institutions in no way connected with the case. The situation is one which demands the exercise of a sound discretion by the court to protect not only the corporations, in which the plaintiffs are stockholders and in whose interests they sue, but banking institutions in no wise connected with the cause, from being unduly oppressed and harassed by unnecessarily disclosing their intimate business affairs when the plaintiffs have it in their power to obtain the facts, so far as they are material, through the inspection and production of the documents and books of the corporations.

The objections to the interrogatories are sustained.